1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

8

### EASTERN DISTRICT OF CALIFORNIA

9

10 JASON LATRELL THOMAS,　　　　　　Case No.  1:10-cv-00006-AWI-SKO PC

11 　　　　　　Plaintiff,　　　　　　ORDER GRANTING REQUEST FOR
　　　　　　　　　　　　　　　　　JUDICIAL NOTICE (Doc. 64)

12 　　　v.

　　　　　　　　　　　　　　　　　FINDINGS AND RECOMMENDATIONS
13 M. WILBER, et al.,　　　　　　　RECOMMENDING DEFENDANTS'
　　　　　　　　　　　　　　　　　MOTION FOR SUMMARY JUDGMENT BE
14 　　　　　　Defendants.　　　　　GRANTED IN PART AND DENIED IN
　　　　　　　　　　　　　　　　　PART (Doc. 62)

15

　　　　　　　　　　　　　　　　　OBJECTION DEADLINE: TWENTY DAYS
16 　　　　　　　　　　　　　　　　RESPONSE DEADLINE: TEN DAYS

17 _____/

18 　　　**Findings and Recommendations on Defendants' Motion for Summary Judgment**

19 **I.　　　Background**

20 　　　　　Plaintiff Jason Latrell Thomas ("Plaintiff"), a state prisoner proceeding pro se and in forma

21 pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983 on January 4, 2010.   This

22 action is proceeding on Plaintiff's verified complaint against Defendants Salinas, Jr., Maldonado,

23 Wilber, Vikjord, Frescura, Price, Hernandez, and Castro ("Defendants") on Plaintiff's numerous

24 First Amendment and Eighth Amendment claims.[1]   Plaintiff's claims arise from a series of

25 allegedly related events which occurred at California State Prison-Corcoran ("Corcoran") in 2006

26 and 2007.   During the time of the events in question, Plaintiff was housed in the Security Housing

27

28 ─────────────
[1] Plaintiff's Fourth Amendment claim was dismissed for failure to state a claim, and some of Plaintiff's asserted First and Eighth Amendment claims were dismissed for failure to state a claim.  (Docs. 12, 15.)

Unit ("SHU") at Corcoran, and Defendants were employed by the California Department of Corrections and Rehabilitation ("CDCR") at Corcoran.

On May 20, 2013, Defendants filed a motion for summary judgment.[2]  (Docs. 62-65, 67.) After obtaining a stay due to his hospitalization for mental health issues, Plaintiff filed an opposition on August 1, 2013; and after obtaining an extension of time, Defendants filed a reply and evidentiary objections on September 13, 2013.  (Docs. 74, 75, 77, 79, 80.)  Pursuant to the order issued concurrently with these findings and recommendations, Plaintiff's surreply, filed on October 4, 2013, and his supplemental evidence, filed on October 28, 2013, will be considered by the Court.[3]  (Docs. 82, 85.)

## II.    Summary Judgment Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); *Washington Mutual Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  *In re Oracle Corp.*

---

[2] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion.  *Woods v. Carey*, 684 F.3d 934, 939-41 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 960-61 (9th Cir. 1998).

[3] Plaintiff's surreply is neither verified nor accompanied by evidence.  The supplemental exhibits submitted by Plaintiff are Defendant Vikjord's (1) responses to Plaintiff's interrogatories and (2) responses to Plaintiff's requests for admission.

*Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp.*, 627 F.3d at 387 (citing *Celotex Corp.*, 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), *cert. denied*, 132 S.Ct. 1566 (2012).  The Court determines *only* whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

## III.   Evidentiary Objections and Request for Judicial Notice

### A.   Defendants' Objections[4]

As an initial matter, Plaintiff's complaint and his opposition are verified, and as a result, the Court is required to treat them as opposing declarations to the extent they are based on Plaintiff's personal knowledge of facts admissible in evidence. *Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004).

In support of his opposition, Plaintiff submits his declaration, the declarations of inmate witnesses, and various documents.[5]  Defendants object to some of the statements made in the

---

[4] Although Plaintiff purports to dispute some of Defendants' facts, he does not set forth any specific evidentiary objections requiring rulings.

[5] Pages 1 through 7 of Plaintiff's opposition are also verified and have evidentiary value to the extent they set forth facts admissible in evidence which are within Plaintiff's personal knowledge.  *Jones*, 393 F.3d at 922-23.

declarations, Plaintiff's handwritten inmate appeals copies, and three medical records. Defendants' objections are sustained in part and overruled in part, as follows.

### 1.   Objections 1 Through 3

Defendants' objections 1 through 3 to Plaintiff's declaration statements are overruled.

Plaintiff denies he committed the rules violation for which he was written up (covering his light) and he is therefore competent to testify that the Rules Violation Report ("RVR") authored by Defendant Vikjord was false.  Fed. R. Evid. 701; *Nevada Dept. of Corrections v. Greene*, 648 F.3d 1014, 1019-20 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1823 (2012); *Barthelemy v. Air Line Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (per curiam).

Plaintiff is also competent to testify that he complained to Defendants Maldonado and Salinas and they did nothing.  Fed. R. Evid. 701.  The latter part of the sentence may be speculative with respect to whether they *ever* did anything in response to his complaint, but the objection is overruled to the extent Plaintiff is attesting they did nothing at the time Plaintiff complained to them and/or they did nothing of which Plaintiff was aware.  *Greene*, 648 F.3d at 1019-20.

Plaintiff is also competent to testify that Nurse Ramos documented the injuries he sustained to his head prior to throwing himself on the ground, as he was present during these events.  Fed. R. Evid. 701.

### 2.   Objection 4

Defendants' objection 4 is sustained.  Nurse Ramos's statement is hearsay and more critically, it is unclear how Plaintiff is aware of what she told prison investigators.[6]  Fed. R. Evid. 701(a), 801(c), 802.

### 3.   Objections 5, 7, 8, and 14

Defendants' objections to Plaintiff's inmate appeals dated November 17, 2006, February 28, 2007, March 14, 2007, and April 16, 2007, for lack of authentication are sustained.  The Court views objections to official prison records for lack of authentication with disfavor, Fed. R. Evid. 901(b)(4); *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532-33 (9th Cir. 2011); *Orr v. Bank of*

---

[6] The report Nurse Ramos wrote, which is subject to Defendants' objection 30, is admissible..

*America, NT & SA*, 285 F.3d 764, 778 n.24 (9th Cir. 2002), but these appeals were never accepted for review or assigned log numbers nor has Plaintiff made any other showing sufficient to authenticate the documents. Fed. R. Evid. 901(a).

### 4.   Objection 6

Defendants' objection 6 to the returned mail marked "deceased," on authentication grounds, is overruled.  Fed. R. Evid. 901(b)(4); *Las Vegas Sands, LLC*, 632 F.3d at 532-33; *Orr*, 285 F.3d at 778 n.24.

### 5.   Objections 9 Through 13

Defendants' objections 9, 10, 11, 12, and 13 to statements made by inmate Eugene Martin in his declaration are sustained.  The statements do not pertain to Plaintiff's legal claims and are therefore irrelevant, Fed. R. Evid. 401, and the statements may not be used as character evidence against Defendants, Fed. R. Evid. 404.

### 6.   Objections 15 and 16

Defendants' objections 15 and 16 to statements made by inmate Gregory Curry in his declaration, made pursuant to Fed. R. Evid. 701 and 704, are overruled.  Fed. R. Evid. 701(a), 704(a); *Greene*, 648 F.3d at 1019-20; *Barthelemy*, 897 F.2d at 1018.

### 7.   Objections 17 Through 29

Defendants' objections 17 through 29 to statements made by inmates Barry Lamon and William Robinson in their declarations are sustained.  The statements are not relevant to Plaintiff's claims and they constitute impermissible character evidence.  Fed. R. Evid. 401; Fed. R. Evid. 404.

### 8.   Objection 30

Finally, Defendants' objection 30 to the three medical reports completed by medical staff on authentication grounds is overruled.  These documents are official prison records.  Fed. R. Evid. 901(b)(4); *Las Vegas Sands, LLC*, 632 F.3d at 532-33; *Orr*, 285 F.3d at 778 n.24.

### B.   Judicial Notice

Defendants request that the Court take judicial notice of court records concerning case numbers 1:07-cv-00889-SMM (E.D. Cal.) *Norwood v. Hubbard* and 1:06-cv-01332-JLT (E.D.

Cal.) *Thomas v. Sheppard-Brooks*.

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The Court may take judicial notice of court records, *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007); *United States v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir. 2004); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980), but "[f]actual findings in one case ordinarily are not admissible for their truth in another case through judicial notice," *Wyatt v. Terhune*, 315 F.3d 1108, 1114 n.5 (9th Cir. 2003).

Accordingly, Defendants' request for judicial notice is granted, subject to the parameters identified herein.

**IV.   Discussion**

    **A.   Background**

The allegations set forth in Plaintiff's complaint are largely conclusory and as a result, Plaintiff's multiple legal claims not as clearly defined as would be ideal.  The Ninth Circuit has repeatedly held that pro se litigants are entitled to leniency, *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012); *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); *Silva v. Di Vittorio*, 658 F.3d 1090, 1101 (9th Cir. 2011); *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010), and in addition, it has described the screening threshold as "low," *Wilhelm*, 680 F.3d at 1121.  Given these parameters, the Court screened Plaintiff's complaint and determined that some claims were sufficient to survive screening while others were deficient.  (Docs. 1, 12.)  Plaintiff elected not to file an amended complaint curing the deficiencies in his non-cognizable claims, and this action proceeded on the claims found to be cognizable by the Court in its screening order.  (Docs. 13, 15.)

At this stage in the proceedings, Defendants have moved for summary judgment and, so long as they meet their initial burden, they are entitled to judgment on the claims against them unless Plaintiff is able to demonstrate the existence of triable issues of fact.  While Plaintiff's

1  complaint and opposition must be treated as opposing declarations, he nevertheless may not rely

2  on mere conclusory assertions to demonstrate the existence of triable issues of fact.

3      Given the relative brevity of Plaintiff's complaint and opposition with respect to factual

4  development, resolving Defendants' motion for summary judgment presents some challenges in

5  relation to determining precisely what Plaintiff's claims are and against whom.   The Court's

6  screening order controls and the Court will address each of Plaintiff's claims as identified in the

7  screening order.  In doing so, it is helpful for clarity of the record to reiterate the underlying bases

8  for Plaintiff's multiple of First and Eighth Amendment claims against eight defendants, claims

9  which he asserts arose during a ten-month long "campaign" of retaliation against him.  (Comp.,

10  ¶17.)

11      In his complaint, Plaintiff alleges that on August 6, 2006, he filed an inmate appeal

12  complaining that Officer James and Defendant Wilber failed to protect him from an attack by his

13  cellmate.  Plaintiff apparently filed at least one other grievance, and he alleges that Defendants

14  Wilber, Vikjord, Price, and Frescura began retaliating against him soon after his grievances were

15  processed.

16      Plaintiff further alleges that on September 11, 2006, Defendants Price and Frescura were

17  involved in an incident in which inmate Norwood was stabbed by another inmate.  The weapon

18  was not recovered, and Plaintiff alleges that Defendants were told, in error, that Plaintiff filed an

19  inmate appeal stating he witnessed Defendants Price and Frescura, in an effort to assist inmate

20  Norwood's assailant, remove the weapon from the crime scene.

21      Plaintiff alleges that based on these events, Defendants embarked on ten-month campaign

22  of retaliation against him, which included using physical force against him, tampering with his

23  food, calling him names, filing a false Rules Violation Report against him, writing "deceased" on

24  a letter, destroying his personal property, and throwing away his grievances.

25  ///

26  ///

27  ///

28

**B.**      **Defendants' Statement of Facts in Support of Their Motion**[7]

1.      At all times relevant to this action, Plaintiff was an inmate in the custody of the CDCR, housed at Corcoran.  Plaintiff is currently serving twenty-five years to life for a conviction of first degree murder and attempted robbery with a handgun.

2.      At all times relevant to this action, Defendants were employed by CDCR at Corcoran. Defendants Wilber, Vikjord, Frescura, Price, Hernandez, and Castro were correctional officers, and Defendants Salinas and Maldonado were correctional sergeants.

3.      The 4B unit at Corcoran is a SHU, which means that the inmates there are confined to their cells twenty-three hours a day.  There are sixty-four cells in a unit.  The inmates living in this unit are classified as level-four security inmates, which is the highest level of security in the California prison system.   SHU inmates are not permitted to work prison jobs or participate in most programs.  Many have been convicted of violent felonies, both inside and outside prison, and are considered very dangerous.  They must be supervised and escorted at all times.  An escort of a SHU inmate requires two correctional officers.

4.      Floor officers in unit 4B2L were responsible for facilitating the daily routine of the SHU inmates (such as meals, mail, appointments, and showers), maintaining the safety and security of the unit, and supervising the inmates and their movement within the unit.  Officers were required to conduct three random cell searches every day and they have probably searched every 4B2L inmate's cell on at least one occasion.  For safety purposes, two floor officers were assigned to supervise unit 4B2L at all times.

5.      Many inmates would file grievances against the defendants, as correctional officers and sergeants, for various reasons, especially the inmates such as Plaintiff, who were serving life sentences, confined to their cells almost all day in the SHU, and dissatisfied with prison life in the SHU.[8]

---

[7] Doc. 63.
[8] The terms grievance and appeal are used interchangeably.

6.      Having grievances filed against them did not cause Defendants to do their jobs any differently.  Defendants did not retaliate against Plaintiff, or destroy or throw away his grievances, because of prior grievances he filed against them.

7.      Regarding the preparation and delivery of meals, the kitchen staff prepares all of the food for the inmates.  This process is completed offsite, away from the 4B2L unit.

8.      Defendants had no involvement in meal preparation.

9.      Once the food is prepared, it is delivered to each housing unit, in large pans.  The officers on duty then put the food on individual meal trays and stack the trays onto meal carts for delivery to the inmates.  The officers then deliver a meal tray from the cart to each inmate in his cell. Multiple officers are involved with the distribution of the meal trays simultaneously, so that all of the SHU inmates receive their food in a timely and efficient manner.  Because the meal trays are stacked onto multiple identical carts, there is no way to know with certainty which meal tray will be delivered to which inmate.

10.     Defendants did not put hair, dust, liquid detergent, or other harmful substances into Plaintiff's meals.

11.     In 2006 and 2007, if an inmate was dissatisfied with anything occurring in the prison, he was supposed to write out his grievance, or inmate appeal, on a CDCR 602 form, and put the appeal in the grievance box.

12.     The grievance box is located in the housing unit.  It is metal, tamper-proof, and always locked.  Only the correctional sergeants who supervise the housing unit have a key to access the grievance box.

13.     Every day, a sergeant would retrieve all of the appeals from the grievance box.  The sergeant would sort through the appeals and forward each appeal to the appropriate office.  For example, if an inmate had complained about not receiving his mail, the sergeant would forward the appeal to the mail office so the employees there could attempt to resolve the issue.

14.     Sometimes, an inmate would attempt to circumvent the grievance process by sending his appeal straight to the appeals coordinator through the mail.  When this happened, the appeals

coordinator would typically issue the grievance a log number and send it back to the appropriate office or housing unit to resolve the issue.

15.     If an appeal complained of staff misconduct, such as retaliation, the appeal would typically bypass the informal and first formal levels of review, and the sergeant would forward it directly to the appeals coordinator for review (not to the officer(s) subject to the complaint).

16.     Ultimately, sergeants were not allowed to decide whether an investigation into an appeal alleging staff misconduct should be conducted, and sergeants did not have the authority to conduct investigations.  Sergeants also lacked the authority to make any substantive determinations of fact regarding the veracity of any allegations of staff misconduct contained in an inmate's appeal.

17.     Defendant Maldonado does not recall any interview with Plaintiff taking place on or around March 12, 2007, and he has no reason to believe such an interview occurred.

18.     Defendants Salinas and Maldonado do not recall Plaintiff verbally complaining that other officers were taking retaliatory action against him.

19.     Defendants Salinas and Maldonado remember reviewing numerous appeals from the inmates in their unit complaining about retaliation, but when they received such appeals, they were still constrained by their job duties to forward the appeal to the appeals coordinator's office for further action.

20.     Many inmates would also file grievances against the sergeants because they were in supervisory positions and the inmates expected them to be responsible for any perceived wrong that had been taken against the inmates by various correctional officers in the housing unit.

21.     Due to the nature of the sergeant position, which required the sergeants to screen and sort all inmate appeals in the box, Defendants Salinas and Maldonado were aware that inmates complained about them, but they considered it part of the job and having grievances filed against them did not cause them to do their jobs any differently.

22.     Inmate mail was first received from the mail room, which would sort out all the mail according to housing facility.  If any part of the mail package was not delivered to the inmate, the inmate would receive a form notifying him that something was taken out, and why.  If the inmate was gang-validated, the mail would additionally be sorted by ISU (Investigative Services Unit).

1    Once the mail reached the specific housing facility, it would be distributed to the inmates by the

2    housing unit officers who worked the night shift.

3    23.    Sergeants did not handle inmate mail.

4    24.    Plaintiff's medical records indicate that he suffers from an unspecified mood disorder,

5    dating back to adolescence.  He has attempted suicide on at least two occasions in the past,

6    including two overdoses in August and September 2003.  His prior psychiatric history dates back

7    to at least March 2004, during which time he was placed on involuntary medication and was noted

8    to have a history of unstable mood and behavior.  At that time, Plaintiff had been combative and

9    assaultive toward staff, receiving multiple disciplinary write-ups for violently resisting staff and

10   making a threat to the recreational therapist in March 2004 that he was going to kill every one of

11   the correctional officers in his building.  Plaintiff's involuntary medications were extended another

12   six months, to April 2005.

13   25.    Plaintiff also has a history of auditory hallucinations and was observed to be quite paranoid

14   in his thinking, as well as exhibiting depressive affect when frustrated.  He continued to have

15   bouts of decompensation and assaultive behavior, and it was noted that he required three

16   admissions to the hospital in the month of July 2005 and he required restraints.    Against

17   advisement, Plaintiff took himself off medications several times in 2005, resulting in his

18   decompensation.

19   26.    It is not uncommon for inmate-patients suffering from mood disorders to believe that the

20   custodial staff members are "out to get them," and many of Dr. Talisman's mental health patients

21   have accused correctional officers of trying to poison them by putting liquid detergent or other

22   types of harmful substances in their meals.[9]

23   27.    Prior to his hospital admission on August 25, 2007, Plaintiff was complaining of non-

24   responses to numerous prison grievances against the unit officers for harassment.  He blamed the

25   officers for his suicidal and homicidal impulses, claiming that his homicidal feelings toward

26   various staff were not his responsibility but others' responsibility.  Plaintiff complained of racing

27

28   [9] Dr. Talisman is a physician and surgeon who worked at Corcoran's prison hospital during 2006 and 2007, and he
     treated Plaintiff a number of times.

thoughts and stated that if the harassment continued, he would kill one of the unit third watch officers by "spearing or ramming a manufactured weapon into his neck, [and] if it [did] not kill him, the feces on the tip [would] get in the blood stream and surely cause harm."  He stated he was doing this because of "cruel and malicious retaliation."  The week before he was admitted to the prison hospital for suicide watch, Plaintiff had made written threats to harm a correctional officer in the 4B2L housing unit.

28.     Plaintiff's medical records also indicate that, as early as December 2006, Plaintiff tested positive for hepatitis.

29.     It is not medically possible to contract hepatitis through the consumption of substances such as liquid detergent, hair, or dust.

30.     Between 2006 and 2008, Plaintiff was consistently taking antidepressant, antipsychotic, and mood-altering medications, such as Bupropion (Wellbutrin), Seroquel, Zyprexa, Depakote, Divalproex, Risperidone, Quetiapine, Olanzapine, and Fluoetine, all of which carry common side-effects that include dizziness, headaches, and incomplete or infrequent bowel movements, and that may also include weight loss, nausea, diarrhea, stomach cramps, loss of appetite, and indigestion.

31.     During that same period, Plaintiff was often prescribed Polycarbophil, Milk of Magnesia, Docusate Sodium, and Genfiber, all of which are used to treat symptoms of irritable bowel syndrome, abdominal pain, and constipation.

32.     Plaintiff claims the retaliation started because of a grievance he submitted in late July or early August 2006 in which he complained that Defendant Wilber failed to protect him from an attack by his cellmate.

33.     On August 18, 2006, the appeals coordinator's office received Plaintiff's grievance and it was assigned log number CSPC-6-06-03161.

34.     The grievance complained that Defendant Wilber acted with deliberate indifference in ignoring the "R" suffix affixed to Plaintiff's custody level, thereby placing Plaintiff's safety in jeopardy as other inmates might conclude he was a sexual predator or rapist.  The appeal was originally classified as a "custody/class" complaint, bypassing the informal and first formal levels of review, but the grievance was later reclassified and remanded back to the first level of review,

where it was partially granted on December 11, 2006.  The record indicates that Plaintiff did not pursue this appeal any further.

35.     Meanwhile, on October 3, 2006, Plaintiff filed case number 1:06-cv-01332-LJO-SMS, *Thomas v. Sheppard Brooks*, asserting the same claim against Defendant Wilber and other correctional officers.   In that action, Plaintiff claimed, under penalty of perjury, that he was retaliated against because the defendants had learned of Plaintiff's indecent exposure violations. Plaintiff did not pursue appeal CSPC-6-06-03161 any further.  Eventually, the issue went to trial and the defendants prevailed.

36.     On September 11, 2006, innate Norwood, a black inmate at Corcoran, was stabbed by a white inmate.

37.     Plaintiff believes, in part, that Defendants retaliated against him because they believed he had filed a grievance alleging that Defendants Price and Frescura orchestrated and then tried to cover up the September 11, 2006, Norwood stabbing.

38.     On June 22, 2007, inmate Kenneth Norwood filed a lawsuit against several CDCR employees, including Officers Frescura, Price, and Maldonado, claiming deliberate indifference in relation to the September 11, 2006, incident.   On December 9, 2011, the Court granted the defendants' motion for partial summary judgment in case number 1:07-cv-00889-SMM (E.D. Cal.) *Norwood v. Hubbard*, and dismissed Officers Frescura, Price, and Maldonado from the lawsuit.

39.     Defendants Frescura, Price, and Maldonado were only involved in the Norwood incident as responding officers, and they were never the subject of any investigation.

40.     At the time the Norwood incident occurred, Plaintiff was also housed in unit 4B2L, but none of the cells in the housing unit face one another.  Thus, from inside his cell, it would have been physically impossible for Plaintiff to have witnessed the incident, to have seen into Mr. Norwood's cell, or have other personal knowledge of what occurred.

41.     The filing of inmate grievances against Defendants did not influence the performance of their duties.

42.     Plaintiff claims that Defendants Salinas and Maldonado had a policy of covering up the destruction of grievances based on the fact that he put his grievances in a locked grievance box that only the sergeants had access to and he never heard back on the grievances.

43.     Defendants Salinas and Maldonado worked different shifts, however, and Plaintiff never saw them talking together about his grievances.

44.     Defendant Salinas spoke with Plaintiff about a grievance only once, in January 2007.  The grievance concerned a complaint that officers were destroying Plaintiff's mail.

45.     At no time did Defendant Maldonado or Defendant Salinas believe that Defendants Vikjord, Price, Frescura, Castro, Wilber, and Hernandez were acting in any way contrary to CDCR policy in order to retaliate against Plaintiff.

46.     Plaintiff claims that on March 12, 2007, Defendant Maldonado interviewed him about the allegedly destroyed grievance against Defendant Vikjord that Plaintiff had submitted around November 2006.

47.     This is the only instance that Plaintiff claims Defendant Maldonado spoke to him about a grievance.

48.     Plaintiff claims that on November 1, 2006, Defendant Vikjord threatened him by giving him a letter with the word "deceased" written on the front of the envelope.

49.     Plaintiff did not see Defendant Vikjord or anyone else write the word "deceased" on the envelope.

50.     Plaintiff alleges that Defendants Vikjord and Frescura threatened to file false disciplinary reports against Plaintiff on only one occasion, which occurred on an unspecified date sometime between October and November 2006.  Plaintiff claims that Defendant Vikjord then issued a false RVR against him on November 18, 2006.

51.     Regarding inmate discipline, Defendant Vikjord and Frescura follow CDCR's policy on "progressive discipline."   This means that the first time an inmate is discovered engaging in behavior violative of CDCR policy, the inmate is verbally counseled.  The second time, the inmate is issued a written warning.  The third time, the inmate is issued an RVR.

14

52.     Defendants only counsel and issue disciplinary reports where an inmate has violated CDCR policy and therefore presents a danger to the safety and security of the institution.  They have never threatened to issue, or actually issued, an inmate a disciplinary report for an action that he did not commit.

53.     Plaintiff's C-file (central file) reflects that between 2006 and 2007, Defendant Vikjord was involved with only one of the RVRs that Plaintiff received while he was housed at Corcoran: RVR log number 4B-06-11-016.

54.     On November 21, 2006, Plaintiff received an RVR for creating a "security breach by obstructing" his view into his cell, a violation of California Code of Regulations, Title 15, section 3005(a).  On December 22, 2006, Plaintiff was convicted of the charge in the RVR, resulting in a ninety-day time credit forfeiture.

55.     Pursuant to the RVR, on November 10, 2006, Defendant Vikjord ordered Plaintiff to remove personal papers that Plaintiff had placed over his cell light, because it obstructed the view into Plaintiff's cell.  Inmates are not permitted to place papers over the cell light because the resulting obstruction of the view into the cell creates a serious breach of security, and it poses a potential threat to the safety of both staff and other inmates.  Plaintiff was verbally counseled as a result of this incident.

56.     Pursuant to the RVR, on November 16, 2006, Defendant Vikjord discovered Plaintiff had placed papers back over his cell light, which against obscured the view into Plaintiff's cell. Defendant Vikjord again ordered Plaintiff to remove the papers, this time issuing Plaintiff a CDC 128-A counseling chrono.

57.     Pursuant to the RVR, on November 18, 2006, at approximately 2:45 p.m., Defendant Vikjord discovered that Plaintiff had again placed papers over his cell light, obscuring the view into his cell.  Defendant Vikjord ordered Plaintiff a third time to remove the papers, this time filing an RVR.

58.     At the hearing on the RVR, Plaintiff claimed that the RVR was "bogus," and that Defendant Vikjord told him on November 17 that he was going to write a bogus 115 (RVR) against Plaintiff because Plaintiff "wrote his co-workers up."

59.     Plaintiff also challenged the RVR conviction by filing a prison grievance to have the conviction overturned, but his appeal was denied.

60.     To date, Plaintiff's RVR conviction has not been overturned, reversed, or otherwise invalidated.

61.     Plaintiff claims that Defendant Vikjord and Frescura called him "snitch" and "child molester" often, starting in November 2006.

62.     The only specific incident Plaintiff can recall occurred on March 15, 2007.  Plaintiff claims that while he was in the shower, he asked Defendant Frescura for a razor, and Frescura threw the razor at Plaintiff and called him a "snitch."  Plaintiff claims that Defendant Vikjord then called Plaintiff a "child molester."  Plaintiff claims that other inmates in cells nearby heard Defendants Vikjord and Frescura's comments.

63.     Plaintiff was never subsequently attacked by any inmates after he was allegedly called a snitch and a child molester.

64.     Plaintiff stated that he was in no danger of being attacked because he lived isolated in his cell in the SHU.

65.     Rather, the other inmates who overheard the name calling encouraged Plaintiff to sue Defendants, asking him, "Man, are you going to let this accusation go on?"

66.     Neither Defendant Vikjord nor Defendant Frescura ever called Plaintiff a "snitch" or "child molester," and they never believed that Plaintiff would be "at risk" if other inmates believed Plaintiff was a "snitch" or "child molester."

67.     Plaintiff claims that on March 17, 2007, Defendant Vikjord put hair, dust, and detergent in and on Plaintiff's dinner meal.

68.     Plaintiff alleges the other Defendants began putting detergent in his food around March 2007.  He believes it happened about twice a week.

69.     Plaintiff's claim is based on the assumption that it would be impossible for an officer to not notice someone putting detergent in Plaintiff's food, and none of the Defendants spoke up or stopped the food tainting.  Therefore, they must have all been in on it and tainting Plaintiff's food together.

70.     Plaintiff claims that he visited the doctor eleven or twelve times due to stomach issues, and he received fiber and stool softeners.

71.     Plaintiff admits the meals are prepared offsite, and he did not see Defendant Vikjord prepare his dinner tray or see Defendant Vikjord put items in his meal.

72.     Plaintiff similarly never saw any of the Defendants actually put items in his food.

73.     When Plaintiff saw hair or dust on his food, or believed his food contained harmful substances, he would not eat it.

74.     Plaintiff has no medical training.

75.     Plaintiff's treating physician never told Plaintiff that hepatitis could be contracted from ingesting food with dirt, hair, or detergent in it.

76.     Plaintiff recalls no diagnosis regarding ingestion of toxic substances.

77.     Plaintiff's records indicate that he tested positive for hepatitis at least as early as December 2006.

78.     Plaintiff's records indicate that, on numerous occasions, he received milk of magnesia and was treated for constipation both well before and well after the period during which he alleges Defendants tampered with his food.

79.     On August 25, 2007, Plaintiff was taken to prison hospital, or infirmary, because he claimed he was suicidal.

80.     Around 8:20 p.m., before Plaintiff was escorted from his housing unit in 4B2L to the infirmary, Nurse Kush examined Plaintiff.  She noted Plaintiff had no injuries.  Defendant Hernandez witnessed the examination.

81.     Defendants Hernandez and Vikjord then escorted Plaintiff from his housing unit, 4B2L, to the infirmary.

82.     Once they reached the infirmary, Defendants Hernandez and Vikjord remained with Plaintiff and continued to provide custodial supervision until the medical staff was ready to process Plaintiff into the suicide watch unit.

83.     Plaintiff claims that during the escort, Defendant Vikjord called him a "crybaby," and punched him in the head while Defendant Hernandez stood by and watched.  Plaintiff also claims

1   that upon arrival at the infirmary, he immediately sought medical treatment for his head, which

2   had already developed a lump from where Defendant Vikjord punched him.   Nurse Ramos

3   examined him but was reporting that Plaintiff had no injuries on the medical form.   This caused

4   Plaintiff to become extremely agitated, and he began throwing himself onto the ground,

5   screaming, and yelling.

6   84.    The medical 7219 form completed by Nurse Ramos indicates the following: at

7   approximately 8:48 p.m., Plaintiff began to throw himself, "forcefully," headfirst, onto the floor,

8   banging his forehead against the floor and wall.   Nurse Ramos observed Plaintiff bang his own

9   head against the ground two times before officers and medical staff were able to gain control of

10  Plaintiff and restrain him from further harming himself.

11  85.    Plaintiff later received an RVR and, based on his actions on August 25, 2007, starting at

12  approximately 8:50 p.m., he was convicted by a preponderance of the evidence of the charge of

13  "resisting a peace officer resulting in the use of force," resulting in a ninety-day credit forfeiture.

14  86.    Officers Borges and Hubach issued the RVR.   Officer Ortega investigated the events

15  described in the RVR, and Officers Becerra, Daulton, Goranson, Lara, and Caluag, and Nurse

16  Lewis submitted incident reports providing the factual account upon which Plaintiff's RVR

17  conviction was based.

18  87.    The RVR indicates that at approximately 9:00 p.m., based on Plaintiff's refusal to take

19  prescribed medication and his display of "bizarre behavior," Dr. Talisman ordered that Plaintiff be

20  involuntarily medicated and placed in five-point restraints for being a danger to himself and

21  others.   At that time, Plaintiff stated, "Get your RVR ready!   You're gonna have to wrestle me!

22  I'm not cooperating. . . .   When the cuffs come off, it's on!   I work out!   Be ready."   Officers

23  Dalton, Lara, Becerra, Vikjord, Hernandez, and Goranson succeeded in placing Plaintiff in

24  restraints around 9:15 p.m., at which time he was admitted to a cell in the crisis unit.

25  88.    At approximately 9:30 p.m., Nurse Lewis documented Plaintiff's injuries after the incident,

26  noting that Plaintiff had an abrasion on his right wrist and a small bump above his right eyebrow.

27  89.    Nurse Ramos also documented the bump on Plaintiff's forehead on a separate 7219

28  medical form, in order make it clear that Plaintiff did not sustain the bump on his head as a result

of the use of force incident (during which Officers Dalton, Lara, Becerra, Vikjord, Hernandez, and Goranson placed Plaintiff in five-point restraints), but prior to that incident, when Plaintiff "forcefully threw himself on the floor."

90.     Upon evaluating Plaintiff that night, Dr. Talisman determined that Plaintiff presented an acute and chronic danger to himself and others, thus necessitating medication.  Therefore, Dr. Talisman recommended in-patient psychiatric treatment with psychotropic medication until Plaintiff's mood was stabilized.

91.     Plaintiff does not allege any other excessive force claim.  As to his allegation in his complaint that Defendants Vikjord, Price, Frescura and Hernandez attacked him while he was restrained in handcuffs, Plaintiff concedes he must have been "confused," because he only intended to assert a claim for excessive force/retaliation against Defendants Vikjord and Hernandez related to the August 25, 2007, incident.

92.     Plaintiff claims that Defendants Vikjord and Frescura illegally searched his cell and destroyed documents on three different occasions: in November 2006, in February 2007, and in August 2007.

93.     The first cell search occurred around the same time that Plaintiff received the RVR on November 21, 2006, for breaching security and covering up his light.

94.     The second cell search occurred around February 2007.  Plaintiff believes he was retaliated against by Defendants because they thought he had filed a grievance against them relating to the September 11, 2006, Norwood stabbing incident.

95.     Plaintiff was in the infirmary at the time of the cell search and did not see who conducted it.

96.     Plaintiff did not personally witness any search conducted in his cell or see which officers confiscated what items, if any.

97.     Plaintiff claims that, in retaliation against him for filing the late July/early August 2006 grievance against Defendant Wilber and the grievance concerning Norwood stabbing that occurred on September 11, 2006, Defendants threw away additional grievances Plaintiff later submitted between November 2006 and September 2007.

98.     Plaintiff claims that, between November 2006 and September 2007, Defendants destroyed approximately fifteen grievances in retaliation against him.  Plaintiff can specifically recall only four of those grievances, however.

99.     The first allegedly destroyed grievance complained about Defendant Vikjord delivering Plaintiff a letter with the word "deceased" written on the envelope, which Plaintiff submitted around November 1, 2006.

100.    Plaintiff did not see anyone destroy the grievance, and Defendant Vikjord never confronted Plaintiff about that grievance.

101.    The second allegedly destroyed grievance complained that Defendants Frescura, Vikjord, and Wilber went into Plaintiff's cell, trashed it, and destroyed his mail log and copies of his original grievances.

102.    Plaintiff did not see anyone destroy the grievance.

103.    The third allegedly destroyed grievance, submitted around February 18, 2007, complained that Defendants Price and Vikjord, while escorting Plaintiff to the infirmary for suicide watch, used excessive force on Plaintiff by "ramming" him into the door during the escort.

104.    Plaintiff did not see anyone destroy the grievance.

105.    The fourth allegedly destroyed grievance complained that, around March 15, 2007, Defendants Frescura and Vikjord called Plaintiff a "rat" while he was in the shower and Frescura shoved a razor at Plaintiff.

106.    Plaintiff did not see anyone destroy the grievance.

107.    Plaintiff cannot recall when the other eleven grievances that he filed were allegedly destroyed, who was the subject of those grievances, or what the subject matter of the grievances was.

108.    None of the Defendants have ever attacked an inmate, while he was in handcuffs or otherwise.

///

///

///

**C.      Plaintiff's Claims**

   **1.      Eighth Amendment Claims**

      **a.      Labeling Plaintiff a Snitch, Rat, and Child Molester**[10]

         **1)      Plaintiff's Allegations**

Plaintiff alleges that on November 28, 2006, Defendant Vikjord came to his cell and, in a voice loud enough for other inmates to overhear, called Plaintiff and his cellmate child molesters. (Comp., ¶30.)   Plaintiff alleges that Defendant Vikjord intended to cause Plaintiff harm at the hands of others because of the grievances he filed and because Plaintiff's "cellmate would not stop him for them."  (*Id.*)  Plaintiff alleges that throughout the next months, Defendants Frescura and Vikjord started labeling him a snitch and a child molester in front of other inmates in an effort to harm Plaintiff for filing grievances.  (*Id.*, ¶31.)

On March 15, 2007, while at the shower, Defendant Vikjord threw a razor at Plaintiff and called him a "nigger rat" and a "snitch" in front of other prisoners, in retaliation against him for filing prison grievances and for the complaints he made during a grievance interview with Defendant Maldonado on March 12, 2007.  (*Id.*, ¶38.)

         **2)      Defendants' Position**

Defendants Frescura and Vikjord deny ever calling Plaintiff a snitch or a child molester, and they deny Plaintiff would have been in any danger in any event.   During the events in question, Plaintiff was living in the SHU, where he was isolated in his cell twenty-three hours a day.   SHU inmates are escorted from their cells to the shower and back again, one at a time; and Plaintiff was not attacked by any other inmates nor was he ever in danger of being attacked due to his isolated SHU housing assignment.   Defendants also assert that in prison, inmates are only endangered if they are accused of snitching on other inmates, not guards.

         **3)      Eighth Amendment Deliberate Indifference Standard**

Section 1983 provides a cause of action for the violation of Plaintiff's constitutional rights by persons acting under color of state law.  *Nurre v. Whitehead*, 580 F.3d 1087, 1092 (9th Cir

---

[10] The screening order filed on May 2, 2011, identified this claim as proceeding against Defendants Price and Vikjord, in error.  ( Doc. 15, n. 1, ¶4.)  Plaintiff's allegations are against Defendants Frescura and Vikjord.  (Doc. 1, ¶31; *see also* Doc. 12, 3:3-4.)

2009); *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).  To state a claim, Plaintiff must demonstrate a link between actions or omissions of each named defendant and the violation of his rights; there is no *respondeat superior* liability under section 1983.  *Iqbal*, 556 U.S. at 676-77, 129 S.Ct. at 1949; *Simmons*, 609 F.3d at 1020-21; *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009); *Jones*, 297 F.3d at 934.

"The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  "[W]hile conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the wanton and unnecessary infliction of pain.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981)).  "What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishment Clause depends upon the claim at issue . . . ." *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995 (1992).  "[E]xtreme deprivations are required to make out a[n] [Eighth Amendment] conditions-of-confinement claim." *Id.* at 9 (citation omitted).  With respect to this type of claim, "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quotations and citations omitted).

Where a prisoner alleges injuries stemming from unsafe conditions of confinement, prison officials may be held liable only if they acted with "deliberate indifference to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).  The deliberate indifference standard involves an objective and a subjective prong.  First, the alleged deprivation must be, in objective terms, "sufficiently serious . . . ." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321 (1991)).  Second, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." *Farmer*, 511 U.S. at 837.  Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial

risk of harm and disregards that risk by failing to take reasonable measures to abate it.  *Id.* at 837-45.  Prison officials may avoid liability by presenting evidence that they lacked knowledge of the risk, or by presenting evidence of a reasonable, albeit unsuccessful, response to the risk.  *Id.* at 844-45.  Mere negligence on the part of the prison official is not sufficient to establish liability, but rather, the official's conduct must have been wanton.  *Farmer*, 511 U.S. at 835; *Frost*, 152 F.3d at 1128.

### 4)   Findings

Defendants Frescura and Vikjord have met their initial burden of setting forth the evidence they believe entitles them to judgment on Plaintiff's Eighth Amendment claim against them.  The burden therefore shifts to Plaintiff to demonstrate the existence of material factual disputes requiring resolution by the trier of fact.  For an Eighth Amendment claim, Plaintiff must demonstrate the existence of factual disputes as to the objective element and the subjective element.

Here, the Court finds that Defendants Frescura and Vikjord are entitled to judgment on the claim against them because Plaintiff has not demonstrated the existence of an objectively serious risk of harm to his personal safety.  While there exists a dispute between the parties regarding whether Defendants Frescura and Vikjord called Plaintiff a snitch and a child molester within ear shot of other inmates, that dispute does not preclude judgment given Plaintiff's failure to  submit sufficient evidence that the name calling created an objectively serious risk of harm to his safety.  Plaintiff is not serving a sentence for any sexually-based crime, there is no evidence that any of the inmates who allegedly overheard believed otherwise, and there is no evidence from which a reasonable trier of fact could find that Plaintiff faced a substantial risk of serious harm to his personal safety as a result of being called a snitch and a child molester.[11]  Therefore, the Court recommends that Defendants Frescura and Vikjord's motion for summary judgment be granted as to this claim.

///

---

[11] Plaintiff attests in his opposition that he had cellmates, but he was in the SHU, not general population, and he testified at his deposition that he was isolated and not subject to attack by other inmates.  (Opp., 6:4-7; Thomas Depo., 45:2-11.)

### b.    Food Tampering

#### 1)    Plaintiff's Allegations

Plaintiff alleges that "the defendants" started tainting his meals with liquid detergent and other harmful substances in retaliation against him for filing grievances, including log numbers 06-03161 (filed August 6, 2006) and 06-3778 (filed September 7, 2006).  (Comp., ¶¶12, 32, 45, p. 41.)  Plaintiff alleges that he would get severely sick to his stomach after eating dinner, he was treated for hepatitis, and to date, he continues takes medication for digestive issues.  (*Id.*, 32.)

Plaintiff also alleges that on March 17, 2007, Defendant Vikjord gave him a dinner tray with hair and dust on top of and mixed into the food.  (*Id.*, ¶40.)  Plaintiff alleges "this went on so much" that he complained to doctors and would go back and forth to the infirmary on suicide watch.  (*Id.*)

#### 2)    Defendants' Position

In his deposition, Plaintiff testified that he believes Defendant Vikjord put hair, dust, and detergent in his dinner meal on March 17, 2007, and that the other defendants began putting detergent in his food approximately twice a week beginning around March 2007.  (Thomas Depo., 59:2-21.)   Defendants Frescura, Vikjord, Castro, Hernandez, and Price, however, had no involvement in meal preparation, and they deny ever putting harmful substances in any inmate's food.  They point out that meals are prepared by kitchen staff off-site away from the 4B2L housing unit where Plaintiff lived.  The food is delivered to the housing unit in large pans, where on-duty officers prepare individual meal trays and stack the trays onto meal carts for delivery to each inmate in his cell.  Multiple officers distribute the meal trays simultaneously so that all inmates receive their food in a timely, efficient manner.  Because the meal trays are stacked on multiple, identical carts for distribution by multiple officers, there is no way to know with certainty which tray will be delivered to which inmate.

Further, Plaintiff never saw any Defendants contaminate his food.  Rather, he believes they did and that all of them must have been involved because it would be obvious if an officer set aside a tray of contaminated food.  (Thomas Depo., 61:17-62:10.)

With respect to the harm Plaintiff alleges, Defendants point out that while Plaintiff contends he was diagnosed with hepatitis and he now takes medication for digestive issues, his medical records document that he was diagnosed with hepatitis as early as December 2006 and he was neither told by his treating physician that he contracted hepatitis from contaminated food nor diagnosed with any ailments caused by ingesting toxic substances.  Dr. Talisman, a licensed physician and surgeon who treated Plaintiff a number of times in 2006 and 2007, attests that hepatitis B is contracted through the injection of blood or fecal matter into the bloodstream, and it is not possible to contract it through the ingestion of liquid detergent, dust, or hair.  Furthermore, Plaintiff has a long history of mental health issues, including auditory hallucinations and paranoid thinking, and he suffers from an unspecified mood disorder.  Dr. Talisman attests that it is not uncommon for inmates suffering from mood disorders to believe that custodial staff are out to get them, and many patients treated by Dr. Talisman accuse correctional officers of trying to poison them by putting liquid detergent or other harmful substances into their food.  These accusations, however, are typically a result of the inmate's delusions and are not substantiated.

With respect to digestive issues, Plaintiff was on anti-depressant, anti-psychotic, and mood-stabilizing medications consistently between 2006 and 2008.  The medications taken by Plaintiff all carried common side effects including dizziness, headaches, incomplete or infrequent bowel movements, and additional known side effects included weight loss, nausea, diarrhea, stomach cramps, loss of appetite, and indigestion.  During that time period, Plaintiff was often prescribed multiple medications used to treat symptoms of irritable bowel syndrome, abdominal pain, and constipation.

### 3) **Findings**

Contaminating an inmate's food with foreign and/or toxic substances is both "devoid of legitimate penological purpose" and "contrary to the evolving standards of decently that mark the progress of a maturing society," *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing *Hudson v. Palmer*, 468 U.S. 517, 548, 104 S.Ct. 3194 (1984)) and *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590 (1958)) (internal quotation marks omitted), thereby supporting the existence of an Eighth Amendment violation.  *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996).  Plaintiff

testified at his deposition that he saw hair and dust in his food and that he detected a strong detergent or disinfectant smell.  Based on Plaintiff's personal observations regarding the sight and smell his food, a reasonable trier of fact could find that Plaintiff's food was tampered with, which suffices to support the existence of a material factual dispute regarding the objective element.[12] (Thomas Depo., 50:23-51:5.)

Furthermore, the risk to an inmate from intentionally-contaminated food is sufficiently obvious to support a finding that prison officials were aware of the risk to Plaintiff.  *Thomas*, 611 F.3d at 1150-51.  However, Plaintiff is required to link Defendants to the food contamination, *e.g.*, *Nurre*, 580 F.3d at 1092; *Long*, 442 F.3d at 1185; *Jones*, 297 F.3d at 934, and he has not done so. (Thomas Depo., 50:18-22 & 61:17-62:7.)

Plaintiff's mere belief that Defendants contaminated his food or that they must have somehow been involved does not suffice to raise a triable issue of fact.  Indeed, Plaintiff concedes that he lacks proof of Defendants' involvement, and their general proximity to the meal tray preparation and/or their involvement in delivering the food amounts to no more than a mere scintilla of evidence.  *Anderson*, 477 U.S. at 248-52; *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).  (Doc. 85, Resp., 2:24.)  Accordingly, the Court recommends that Defendants Wilber, Vikjord, Frescura, Price, Hernandez, and Castro be granted summary judgment on the food tampering claim.

c.      <strong><u>Excessive Force</u></strong>

1)      <strong><u>Plaintiff's Allegations</u></strong>

Plaintiff alleges that on August 25, 2007, Defendant Vikjord called him a crybaby while escorting him in handcuffs from his housing unit to the infirmary.  (Comp., ¶42; Ex. A, p. 23.) When Plaintiff replied that is why he has lawsuits and grievances against Defendant, Defendant Vikjord punched him several times on the right side of his forehead with a closed fist.  (*Id.*) Defendant Hernandez stood there and watched, without intervening.  (*Id.*)

///

///

---

[12] To the extent Plaintiff's mental health issues affect his credibility, that issue is for the trier of fact to determine.

### 2)      **Defendants' Position**

Defendants contend that Plaintiff's claim he was punched in the head is unsupported by the evidence, and because he cannot show he was punched by Defendant Vikjord, he cannot show Defendant Hernandez failed to intervene.

Defendants contend that upon arrival at the infirmary, Plaintiff twice threw himself on the floor headfirst, resulting in an order from Dr. Talisman to place Plaintiff in five-point restraints and to involuntarily medicate Plaintiff.   In response, Plaintiff yelled, "Get your RVR ready! You're gonna have to wrestle me!  I'm not cooperating . . . .  When the cuffs come off, it's on!  I work out!  Be ready."  Defendants argue that despite throwing himself on the floor and hitting his head, Plaintiff claims, implausibly, that he sustained bumps to head not from his own actions but through being hit by Defendant Hernandez.

Plaintiff was subsequently issued a RVR for "resisting a peace officer resulting in the use of force," and his injuries – an abrasion on his right wrist and a small bump above his right eyebrow – sustained in the incident were documented by a nurse.  Defendants contend that the medical form filled out by Nurse Ramos documents that prior to the incident in which Plaintiff was placed in restraints, Plaintiff sustained a small bump on his head, an injury which occurred when he threw himself on the floor.  Defendants argue that the RVR and the medical reports support their version of events and belie Plaintiff's version.

### 3)      **Legal Standard**

The Cruel and Unusual Punishments Clause of the Eighth Amendment protects prisoners from the use of excessive physical force.  *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S.Ct. 1175, 1178 (2010) (per curiam); *Hudson v. McMillian*, 503 U.S. 1, 8-9, 112 S.Ct. 995 (1992).   What is necessary to show sufficient harm under the Eighth Amendment depends upon the claim at issue, with the objective component being contextual and responsive to contemporary standards of decency.  *Hudson*, 503 U.S. at 8 (quotation marks and citations omitted).  For excessive force claims, the core judicial inquiry is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  *Wilkins*, 559 U.S. at 37, 130 S.Ct. at 1178 (citing *Hudson*, 503 U.S. at 7) (quotation marks omitted).

Not every malevolent touch by a prison guard gives rise to a federal cause of action. *Wilkins*, 559 U.S. at 37, 130 S.Ct. at 1178 (citing *Hudson*, 503 U.S. at 9) (quotation marks omitted). Necessarily excluded from constitutional recognition is the *de minimis* use of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind. *Wilkins*, 559 U.S. at 37-8, 130 S.Ct. at 1178 (citing *Hudson*, 503 U.S. at 9-10) (quotations marks omitted). In determining whether the use of force was wanton and unnecessary, courts may evaluate the extent of the prisoner's injury, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7 (quotation marks and citations omitted).

While the absence of a serious injury is relevant to the Eighth Amendment inquiry, it does not end it. *Hudson*, 503 U.S. at 7. The malicious and sadistic use of force to cause harm always violates contemporary standards of decency. *Wilkins*, 559 U.S. at 37, 130 S.Ct. at 1178 (citing *Hudson*, 503 U.S. at 9) (quotation marks omitted). Thus, it is the use of force rather than the resulting injury which ultimately counts. *Id.* at 37-8.

### 4) Findings – Defendant Vikjord

Defendants' reliance on *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769 (2007) for the proposition that Plaintiff's story is so "blatantly contradicted by the record" that no reasonable trier of fact could believe him is unpersuasive. Unlike in *Scott*, there is no videotape of the escort - or any other evidence - which "utterly discredit[s]" Plaintiff's version of events. *Scott*, 550 U.S. at 378-79. Plaintiff has presented evidence, in the form of verified allegations and deposition testimony, that during the escort to the hospital, Defendant Vikjord became enraged and hit him on the top of his head a number of times, causing his head to hurt and knots to form. This suffices to demonstrate the existence of a material factual dispute regarding whether or not Defendant Vikjord used physical force against Plaintiff during the escort on August 25, 2007. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 n.5 (9th Cir. 2004) (citing *United States v. One Parcel of Real Prop.*, 904 F.2d 487, 491-92 (9th Cir. 1990)) (plaintiff's testimony sufficed to create a triable issue of fact and further corroborating was unnecessary).

With respect to evidence of injury, the Court must view the evidence in the light most favorable to Plaintiff, and based on Plaintiff's version of events, he was escorted from his housing unit to the infirmary on August 25, 2007, because he reported he was suicidal.  (Thomas Depo., 53:17-54:7.)  Prior to the escort, N. Kush, a licensed vocational nurse, evaluated Plaintiff at 8:16 p.m. and documented that he had no physical injuries.  (Thomas Depo., 53:23-54:3; Opp., Ex. F, p. 53.)  At 9:00 p.m. at the infirmary, C. Ramos, a registered nurse, documented that at 8:48 p.m., Plaintiff was seen forcefully throwing himself on the floor and banging his head twice, and she documented a small bump on his head "prior to incident."  (Ex. F, p. 54.)  At 9:30 p.m., P. Lewis, a registered nurse, filled out a third report following the use of force involving Plaintiff's placement in five-point restraints at the infirmary.  (Ex. F, p. 55.)  Ms. Lewis documented that officers were attempting to place Plaintiff in five-point restraints and he was struggling and very resistive, and she documented Plaintiff's injuries as a pea or nickel-size lump on his right forehead and a superficial abrasion on his right wrist.  (*Id.*)

Thus, two medical reports written after the escort occurred documented a small bump on Plaintiff's head.  Plaintiff does not dispute that he threw himself on the ground in a fit of hysteria, as Defendants argue, but he maintains that he did so after Defendant Vikjord directed Nurse Ramos not to document the injuries he sustained as a result of being hit by Defendant Vikjord during the escort and which Plaintiff reported to Nurse Ramos upon arrival at the infirmary.  (Thomas Depo., 56:14-20.)  Plaintiff testified that Nurse Ramos documented his injuries after a sergeant intervened and Plaintiff was then placed in restraints.  (*Id.*, 56:20-57:1.)  Plaintiff argues that the notation "prior to incident" meant prior to when he threw himself on the floor in hysteria while Defendants argue that the notation meant prior to being restrained by force but after Plaintiff threw himself on the ground.  The medical report in question could support either version and as result, there exists a material factual dispute regarding whether Plaintiff sustained any injury during the escort from the housing unit to the hospital.

While the injury allegedly sustained by Plaintiff as a result of being struck in the head by Defendant Vikjord was not serious, the lack of serious injury is not determinative.  *De miminis* uses of force are precluded from constitutional recognition, but under the circumstances alleged by

Plaintiff, (1) there was no need for *any* application of force, as he was handcuffed and cooperative during the escort to the infirmary, and (1) Defendant struck him solely out of anger.  Given these circumstances, the Court declines to find that, as a matter of law, the force used was *de minimis*. That determination must be made by the trier of fact and the Court recommends Defendant Vikjord's motion be denied.

### 5)      Findings – Defendant Hernandez

Plaintiff's claim against Defendant Hernandez arises from his failure to intervene when Defendant Vikjord struck him in the head.  In this Circuit, an officer may be held liable for a constitutional violation if he had a realistic opportunity to intervene but failed to do so.  *Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003); *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000); *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995); *see also Motley v. Parks*, 383 F.3d 1058, 1071 (9th Cir. 2004) (neither officers who participated in the harassing search nor officers who failed to intervene and stop the harassing search were entitled to qualified immunity). Defendants Vikjord and Hernandez deny that an incident involving physical force occurred during the escort on August 25, 2007, and as a result, they present no evidence that Defendant Hernandez lacked a realistic opportunity to intervene.  *Robins*, 60 F.3d at 1442 (officers carry the burden of showing they could not intervene).  (Vikjord Dec., ¶¶23, 24; Hernandez Dec., ¶23.)   Because Defendant Hernandez has not carried his burden with respect to his ability or inability to intercede, he is not entitled to summary judgment.  *Id.*

### 2.      First Amendment Retaliation Claims

### a.      Legal Standard

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  *Watison*, 668 F.3d at 1114 (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)).  Also protected by the First Amendment is the right to pursue civil rights litigation in federal court without retaliation.  *Silva*, 658 F.3d at 1104.  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

Defendants move for summary judgment on Plaintiff's numerous retaliation claims on the grounds that he cannot prove engagement in protected conduct, retaliatory intent, or the absence of a legitimate correctional goal. Their specific arguments and evidence, however, relate to the engagement in protected conduct and retaliatory intent.[13]

### b. **Letter Marked "Deceased"**

Plaintiff alleges that on November 1, 2006, Defendant Vikjord handed him a "returned letter" with "deceased" written on it, in retaliation against him for filing grievances. (Comp., ¶19.) Defendant denies ever threatening Plaintiff by writing "deceased" on a piece of mail. (Vikjord Dec., ¶18.)

Plaintiff has submitted the envelope in question, which Defendant Vikjord handed to him, and it does not support his claim that the returned mail bore a threat to him, thereby demonstrating the existence of an "adverse action" against Plaintiff. *Brodheim*, 584 F.3d 1269-70. (Opp., Ex. A, court record p. 13.) Rather, Plaintiff mailed a letter to Inmate Book Service, 1577 Chase Road, Berlin, VT, 05602. (*Id.*) The letter was returned by the postal service with (1) a line through the addressee, (2) a standard postal stamp in which a box appearing to read "unknown" or "undeliverable" is checked, and (3) the handwritten notation "deceased." (*Id.*)

No reasonable trier of fact could conclude that the notation "deceased" on the envelope was a threat directed at Plaintiff, as he claims. To the contrary, the letter was rejected as undeliverable because the addressee was purportedly deceased. Whether the Inmate Book Service was a one-person business and the owner is in fact deceased or whether the letter was rejected in error, either by the postal service or by someone at that address, is unclear, but it is not material. Plaintiff's position that he was threatened via being referred to as "deceased" is not supported by the evidence.

---

[13] Indeed, with the exception of the RVR issued on November 18, 2006, for covering a cell light, the other adverse actions complained of, including but not limited to hitting Plaintiff, labeling him a snitch and a child molester, and tampering with his food, do not lend themselves to an argument that such actions advanced a legitimate correctional goal.

1    Further, even if the Court were to assume arguendo the existence of a triable issue of fact

2    regarding whether the notation "deceased" constituted "adverse action," *Brodheim*, 584 F.3d

3    1269-70, Plaintiff has submitted no evidence that Defendant Vikjord made the notation in

4    question.   Defendant denies doing so and Plaintiff is able to show, at most, that Defendant

5    delivered the letter to him.  (Thomas Depo., 16:10-17:2 & 39:3-40:8; Doc. 84, Vikjord ROGs1-3.)

6    In the absence of evidence that Defendant Vikjord wrote the "threat" on the envelope, liability

7    does not lie.  *Nurre*, 580 F.3d at 1092; *Long*, 442 F.3d at 1185; *Jones*, 297 F.3d at 934.

8    Defendant Vikjord entitled to summary judgment on Plaintiff's retaliation claim arising out

9    of the delivery of the letter marked "deceased."

10              **c.      Threat and Issuance of False RVR**

11                   **1)      Plaintiff's Claim**

12    Plaintiff alleges that in November 2006, Defendants Frescura and Vikjord threatened him

13    with disciplinary action because he kept filing grievances against them, and on November 18,

14    2006, Defendant Vikjord issued him a false RVR for breaching security by covering the light in

15    his cell.  (Comp., ¶¶26, 27.)  Plaintiff alleges that Defendant Vikjord filed other false rules

16    violation reports against him, and he filed grievances in response but he never received responses

17    or log numbers for them.  (*Id.*, ¶29.)

18    At his deposition, Plaintiff testified that it was Defendant Frescura who, on one occasion in

19    November 2006, threatened to file a disciplinary action against Plaintiff after he filed an appeal,

20    and Defendant Vikjord then carried out the threat by filing a false RVR against Plaintiff for

21    covering up the light in his cell.  (Thomas Depo., 36:4-38:13.)

22                   **2)      Defendants' Position**

23    Defendants argue that there is no evidence Defendant Vikjord filed any RVRs against

24    Plaintiff other than the one for covering his cell light in November 2006, and they contend that

25    Plaintiff's claim against Defendant Vikjord for filing that RVR is procedurally barred by the

26    favorable termination rule, also known as the *Heck* bar.  Defendants present evidence that Plaintiff

27    was charged with "security breach by obstructing" on November 21, 2006.  (Def. Ex. G.)  Plaintiff

28    was found guilty of the charge and, in relevant part, he was assessed a ninety-day time credit

1  forfeiture as punishment.  (*Id.*)  Defendants contend that the conviction remains valid.  (Vikjord
2  Dec., ¶14.)

3                          **3)**      **Findings**

4        It has long been established that state prisoners cannot challenge the fact or duration of
5  their confinement in a section 1983 action and their sole remedy lies in habeas corpus relief.
6  *Wilkinson v. Dotson*, 544 U.S. 74, 78, 125 S.Ct. 1242 (2005).  Often referred to as the favorable
7  termination rule or the *Heck* bar, this exception to section 1983's otherwise broad scope applies
8  whenever state prisoners "seek to invalidate the duration of their confinement - either directly
9  through an injunction compelling speedier release or indirectly through a judicial determination
10  that necessarily implies the unlawfulness of the State's custody."  *Wilkinson*, 544 U.S. at 81.
11  Thus, "a state prisoner's [section] 1983 action is barred (absent prior invalidation) - no matter the
12  relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct
13  leading to conviction or internal prison proceedings) - *if* success in that action would necessarily
14  demonstrate the invalidity of confinement or its duration."  *Id.* at 81-2.

15        Plaintiff has not submitted any evidence bringing into dispute the facts that he lost time
16  credits as a result of being convicted of the RVR and that the RVR remains valid.  Therefore, his
17  retaliation claim is barred by the favorable termination rule if a finding in his favor on his claim
18  would necessarily imply the invalidity of the disciplinary conviction, *Wilkinson*, 544 U.S. at 81-2;
19  *Edwards v. Balisok*, 520 U.S 641, 80-81, 117 S.Ct. 1584 (1997), and in this case, a finding in
20  Plaintiff's favor that the RVR was false and was issued against him in retaliation would invalidate
21  the finding of guilt on the charge and the resulting credit loss.  Accordingly, Plaintiff's claim is
22  barred and Defendants Frescura and Vikjord are entitled to dismissal of the claim.  *Heck v.*
23  *Humphrey*, 512 U.S. 477, 489, 114 S.Ct. 2364 (1994) (until and unless favorable termination of
24  the conviction or sentence occurs, no cause of action under § 1983 exists).

25                          **d.**      **Food Tampering**

26        As discussed in section IV(B)(2)(b), Plaintiff alleges that Defendants Wilber, Vikjord,
27  Frescura, Price, Hernandez, and Castro tainted his food with detergent, hair, and dust, in retaliation
28  against him for filing grievances.  Defendants deny ever tampering with an inmate's food, and

Plaintiff has submitted no admissible evidence linking Defendants to any acts of food contamination.   (Thomas Depo., 50:18-22 & 61:17-62:7.)   Mere suspicion or speculation regarding involvement does not suffice; Plaintiff must come forth with some evidence of causation and he has not done so.  *Nurre*, 580 F.3d at 1092; *Long*, 442 F.3d at 1185; *Jones*, 297 F.3d at 934. Accordingly, Plaintiff's retaliation claim against Defendants Wilber, Vikjord, Frescura, Price, Hernandez, and Castro for tampering with his food fails.[14]  *Brodheim*, 584 F.3d at 1269 (citing *Rhodes*, 408 F.3d at 567-68).

### e.    <u>Other Retaliation Claims</u>

### 1)    <u>Summary of Remaining Claims</u>

Plaintiff alleges that at the end of October 2006, Defendant Wilber "confronted" him about the inmate appeal he filed on August 6, 2006, against Defendant Wilber and Officer James. (Comp., ¶¶18, 19.)   Plaintiff filed a grievance on November 10, 2006, complaining about retaliation, but "the defendants intentionally destroyed it."  (*Id.*, ¶20.)   Plaintiff alleges that he resubmitted the appeal on November 17, 2006, and approximately eight times thereafter, but it was destroyed each time.  (*Id.*)

Plaintiff alleges that the only avenues available to file grievances were through institutional mail or placement in the unit grievance box, which only unit sergeants may access.  (*Id.*, ¶¶21, 23.) Plaintiff alleges that the defendants controlled all incoming and outgoing mail and Defendants Salinas and Maldonado were unit sergeants.   (*Id.*)   Plaintiff alleges that he learned Defendants Castro, Frescura, Hernandez, Maldonado, Price, Salinas, Vikjord, and Wilber were working together to throw away his grievances to impede or obstruct his ability to utilize the grievance system.  (*Id.*, ¶22.)  Plaintiff alleges that the defendants also destroyed his personal incoming and

---

[14] Defendants also argue that Plaintiff should be precluded from claiming that his food was tampered with in retaliation against him for filing grievances because he previously claimed in case number 1:06-cv-01332-JLT *Thomas v. Sheppard-Brooks* that his food was tampered with after Defendants learned of his indecent exposure violations.  The doctrine of judicial estoppel protects "the integrity of the judicial process by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'"  *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808 (2001)).  In light of Defendants' entitlement to judgment as a matter of law on this claim, however, the Court does not reach their judicial estoppel argument.

outgoing mail, and Defendants Salinas and Maldonado covered up for other defendants' misconduct and allowed it to go on for months.  (*Id.*, ¶¶26, 43, 46.)

Plaintiff alleges that Defendants Frescura and Vikjord, along with a third officer, entered his cell and destroyed his legal papers, including witness declarations and grievance copies, and his mail log documenting who handled his mail.  (*Id.*, ¶39.)  This incident apparently occurred in March 2007.  (*Id.*)

Plaintiff claims that between November 2006 and March 2007, Defendants Vikjord and Frescura labeled him a snitch and a child molester in retaliation against him for filing grievances.  (*Id.*, ¶31.)

Plaintiff also alleges that Defendants Frescura, Hernandez, Price, and Vikjord attacked him while he was handcuffed and compliant.  (*Id.*, ¶44.)

Plaintiff alleges that on August 25, 2007, Defendant Vikjord called him a crybaby while escorting him in handcuffs from his housing unit to the ER.  (*Id.*, ¶42; Ex. A, p. 23.)  When Plaintiff replied that is why he has lawsuits and grievances against Defendant, Defendant Vikjord punched him several times on the right side of his forehead with a closed fist while Defendant Hernandez stood there and watched, without intervening.  (*Id.*)

### 2)   Engagement in Protected Conduct

Defendants first argue that Plaintiff was not engaged in protected conduct because he was not engaged in filing non-frivolous lawsuits and appeals.  Defendants cite to older out-of-circuit cases to shore up this argument, however, and the law in this Circuit is clear: prisoners have the right to petition the government without retaliation, be it through litigation or prison grievances, and their engagement in those activities is protected conduct.  *Watison*, 668 F.3d at 1114; *Silva*, 658 F.3d at 1104.

Defendants also argue that Plaintiff may not base any retaliation claims on the "Norwood grievance" because no such grievance was ever filed and if one was, it addressed actions taken against another inmate, not Plaintiff.  Accepting Plaintiff's version of events as true, Plaintiff did not file a grievance stating that Defendants Frescura and Price covered up the September 11, 2006, attack on inmate Norwood by removing the weapon from the scene.  However, Defendants

believed he did, and the Court is not persuaded by their argument that even if they thought he did and retaliated against him for it, his retaliation claim fails as a matter of law because he did not actually file the grievance.   The Court is also not persuaded by Defendants' argument that grievance filing is protected conduct only if the inmate is complaining about issues which affect him personally.

Furthermore, the "Norwood grievance" is only one of a number of grievances which allegedly motivated Defendants to retaliate against Plaintiff.   Plaintiff attests that he filed numerous grievances against prison staff, commencing on August 6, 2006, when he filed a grievance against Defendant Wilber and Officer James for failing to protect him.[15]   This grievance was investigated in October 2006, and Plaintiff thereafter filed grievances on November 10, 2006, and November 17, 2006, complaining about the letter marked "deceased."   Additionally, Plaintiff was interviewed by Defendant Maldonado on March 12, 2007, regarding the grievance he filed on November 17, 2006.   This evidence suffices to show that he was engaged in protected conduct during the relevant time period, and the Court rejects Defendants' argument to the contrary.

### 3)      Causation

Next, Plaintiff must show that his pursuit of his prison grievances was the substantial or motivating factor behind the adverse actions taken against him, and Defendants argue that he has not done so.   *Brodheim*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citing *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)).   However, although Defendants assert that the burden on Plaintiff is high, in this Circuit Plaintiff need "only put forth evidence of retaliatory motive that, taken in the light most favorable to him, presents a genuine issue of material fact as to" Defendants' motivation.   *Brodheim*, 584 F.3d at 1271 (citing *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)) (internal quotation marks omitted).   This requires Plaintiff to offer either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence: (1) proximity in time between the protected conduct and the alleged retaliation, (2) expressed opposition to the conduct, or (3) other evidence that the reasons proffered by Defendants for the adverse action were false and pretextual.   *McCollum v. California Department*

---

[15] Comp., ¶12; Opp., 1:18-28, 2:12-19, 4:22-27, Thomas Dec., ¶1, 5; Thomas Depo., 15:7-21:13.

1  *of Corrections and Rehabilitation*, 647 F.3d 870, 882 (9th Cir. 2011) (citing *Allen v. Iranon*, 283

2  F.3d 1070, 1077 (9th Cir. 2002)) (quotation marks omitted).

3                              **a)      Plaintiff's Deposition Testimony**

4        Given the conclusory nature of Plaintiff's complaint and opposition, the Court turns to

5  Plaintiff's deposition in an effort to determine what Plaintiff believes occurred, who was involved,

6  and the underlying motivation.[16]   Although Plaintiff repeatedly asserts that Defendant Wilber

7  confronted him about a grievance he filed in late July or early August 2006, and the retaliation

8  began shortly thereafter, Plaintiff's description of the "confrontation" does not suggest that

9  Defendant Wilber was angered.   To that contrary, Plaintiff testified that Wilber asked Plaintiff

10  why Plaintiff "602'd" him and said, "Why?  We never do nothing to you." (Thomas Depo.,

11  11:21-24.)  Plaintiff contends that a few days later, he received the "deceased" letter.  (*Id.*, 12:2-4.)

12        Plaintiff testified that he submitted approximately fifteen grievances which were destroyed.

13  (*Id.*, 16:1-5.)  Plaintiff identified five specific grievances he recalls submitting which were never

14  processed and assigned a log number.  The first grievance concerned receipt of the letter marked

15  "deceased," and it was submitted in early November 2006.  (*Id.*, 16:9-17:13.)  Another grievance

16  was submitted on February 18, 2007, and concerned the force used against Plaintiff during an

17  escort to the infirmary.  (*Id.*, 26:11- 34:9-12.)  Plaintiff also submitted grievances regarding food

18  tampering and cell searches, and he submitted a grievance following the meeting with Defendant

19  Maldonado on March 12, 2007.  (*Id.*, 27:17, 28:16-29:24.)

20        While Plaintiff never saw anyone destroy the grievances he submitted, he believes they

21  were destroyed because there are two ways to submit grievances – institutional mail and the unit

22  box – and Defendants have control over both.  Plaintiff testified that Defendant Frescura told him,

23  "Yeah, the sergeant said you filed this grievance and this grievance.  It ain't going nowhere." (*Id.*,

24  21:2-4.)  When during the ten month period Defendant Frescura made that statement or in what

25  context is not clear.

26  _____

27  [16] While the Court is not required to mine the record for triable issues of fact, *Simmons*, 609 F.3d at 1017, and it
prefers not to expend its scarce resources doing so, it feels compelled to consider Plaintiff's deposition testimony so as

28  to ascertain the bases for Plaintiff's remaining claims.

Plaintiff testified about three cell searches in which his cell was tossed and his property was confiscated: November 2006, February 2007, and August 2007. (*Id.*, 45:18-23.) Plaintiff also testified that legitimate cell searches in furtherance of institutional safety and security result in the issuance of a cell slip search. (*Id.*, 48:6-14.) The first search, in November 2006, occurred while Plaintiff was in the shower. Plaintiff testified that Defendants Vikjord, Frescura, and Price were involved in the search while Defendant Wilber was in the tower. (*Id.*, 22:15-21, 45:24-46:8.) Plaintiff testified he could not see what was going on inside the cell but he could see officers entering and exiting the cell from the shower, which was located right next to the cell. (*Id.*, 46:14-47:21.) Plaintiff testified that his cell was destroyed: papers were ripped up, books were thrown away, and manila envelopes and copies went missing. (*Id.*, 22:21-24.) Plaintiff also testified that inmates on the top tier looked down and saw officers exiting the cell with a trash can full of Plaintiff's mail, envelopes, and books.[17] (*Id.*, 49:12-50:3.)

Plaintiff also testified that he kept copies of his grievances and a mail log in his cell, and "they" would go into his cell and take those things. (*Id.*, 20:15-20.) With respect to retaliatory motive, Plaintiff testified, "I guess, I don't know, they got word from the sergeant about the 602, but they knew I filed it. . . . They knew because either the sergeant, I am just speculating, but they knew I had filed a 602 about the deceased letter. . . . Well, when I was in the shower and they went through our stuff, my cell, it seemed like they knew I was filing 602s against them." (*Id.*, 46:2-16.)

In Plaintiff's opposition, he alleges that in January 2007, Defendants Price and Frescura violently pushed him and rammed his head against the wall, and that he filed a grievance on February 28, 2007. (Opp., 2:10-13.) At his deposition, Plaintiff testified that on February 18, 2007, approximately, he claimed to be suicidal, and Defendants Price and Frescura escorted him to the infirmary. (Thomas Depo., 25:2-7.) Plaintiff testified they dragged him and slammed him against the exterior unit door. (*Id.*, 25:8-9.) On the way out of the unit, Defendant Price told

---

[17] Although inmate Martin attested that he saw a trash can full of manila envelopes and what appeared to be a large white book, the incident he witnessed occurred on March 15, 2007, and his declaration does not assist Plaintiff with respect to the search in November 2006. (Opp., Martin Dec., p. 23.)

Plaintiff that the reason he was going through what he was going through was because they felt he had filed a grievance claiming they tried to cover up the September 11, 2006, Norwood stabbing. (*Id.*, 25:9-14.) Plaintiff also submits the declaration of inmate Eugene Martin, who attests that on February 18, 2007, he saw Defendant Price violently shoving and pushing Plaintiff across the dayroom floor and slamming Plaintiff's head against the unit door.[18] (Opp., Ex. C, p. 22.)

Plaintiff testified that the second cell search occurred in February 2007, but he was in the infirmary at the time and does not know who conducted the search. (*Id.*, 47:22-48:2.) He testified that when he was in the infirmary, Defendant Price told him they were retaliating against him because they thought he filed a grievance regarding the stabbing of inmate Norwood on September 11, 2006. (*Id.*, 48:1-5.)

Plaintiff attests that on March 12, 2007, Defendant Maldonado interviewed him regarding the appeal he wrote grieving receipt of the letter marked "deceased," but Maldonado had a copy of it rather than the original. (*Id.*, 17:14-18.) Defendants Frescura and Vikjord may or may not have been present during the meeting.[19] (*Id.*, 17:19-24, 27:25-28:4.)

On March 15, 2007, Plaintiff went to shower, where Defendant Frescura called him a "nigger rat." (*Id.*, 29:20-31:5.) Plaintiff also testified that although Defendant Frescura did not tell him directly he was being called a rat because of grievances, a rat is someone who tells on someone else and his grievances were the reason he was called a rat. (*Id.*, 37:7-13.) Plaintiff testified that between November 2006 and the time he left the unit, Defendants Vikjord and Frescura called him a snitch and a child molester, although he recalled only one incident specifically, which occurred on March 15, 2007. (*Id.*, 40:10-25 & 41:19-42:6.)

**b)** **<u>Findings</u>**

**i.** **<u>Use of Force on February 18, 2007</u>**

In their motion, Defendants state in a footnote that Plaintiff recanted this claim during his deposition. (Motion, p. 15, n. 3.) This, however, mischaracterizes Plaintiff's testimony. In the

---

[18] Plaintiff also submits what is purportedly a handwritten copy of the inmate appeal he submitted, in which he complained that on or around February 18, 2007, Defendant Price forcefully pushed and shoved him out of the section. (Opp., Ex. B, p. 16. However, the appeal copy is not admissible. Furthermore, even if the appeal itself were to be considered, Plaintiff's statement is hearsay and the appeal may not be treated as an affidavit.
[19] Plaintiff's deposition testimony was inconsistent on this issue.

screening order, the Court dismissed Plaintiff's excessive force claim Defendants Frescura, Hernandez, Price, and Vikjord for failure to state claim but it found cognizable a retaliation claim arising out of the event.  During Plaintiff's deposition, Defendants inquired about an incident of excessive force and Plaintiff confirmed there was not an incident of excessive force other than the one which occurred on August 25, 2007, involving Defendants Vikjord and Hernandez.  (Thomas Depo., 57:10- 58:7.)  The retaliation claim against Defendants Frescura, Hernandez, Price, and Vikjord for attacking him while he was handcuffed and compliant was not addressed during Plaintiff's deposition, and Defendants' assertion that Plaintiff recanted the claim is not supported.

Defendants deny retaliating against Plaintiff for filing grievances and they contend that they view inmate grievances as a part of their jobs rather than as a source of ill will toward inmates.  However, Plaintiff testified that Defendants Price and Frescura used physical force against him on or around February 18, 2007, while escorting him to the infirmary, and that at the time of the escort, Defendant Price told him he was going through what he was going through because they felt he filed a grievance regarding the Norwood stabbing.  The expressed opposition to Plaintiff's grievance filing occurred either during the escort or shortly after Plaintiff's arrival at the infirmary, and these events suffice to create a triable issue of fact regarding the motivation underlying their use of force.  *McCollum*, 647 F.3d at 882; *Brodheim*, 584 F.3d at 1271.  Plaintiff links only Price and Frescura to this incident, however; Defendants Hernandez and Vikjord are entitled to judgment on this claim.

### ii.   Name Calling

As previously set forth, Plaintiff has submitted sufficient evidence to raise a dispute over whether Defendants Vikjord and Frescura called him names, but to avoid summary judgment, Plaintiff must come forth with evidence of impermissible motive; Plaintiff may not rely on his mere conclusory assertions of retaliatory motive.

Plaintiff alleges that Defendants Vikjord and Frescura called him rat, snitch, and child molester with the intent of causing him harm because he utilized the grievance procedure, but neither his complaint nor his opposition sets forth any evidence supporting the existence of retaliatory motive.   While timing can properly be considered as circumstantial evidence of

retaliatory intent, *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) (quotation marks omitted), here Plaintiff is relying on a timeline of ten months, approximately.  Viewing the evidence in the light most favorable to Plaintiff,  he was called names by Defendants Vikjord and Frescura from November 2006 until he left the unit and during this time, he was submitting grievances against staff, most of which were destroyed but a few of which were processed officially.  The specific incident Plaintiff recalls occurred three days after he was interviewed by Defendant Maldonado about a grievance.  Defendants Vikjord and Frescura may or may not have been present during the meeting.  Additionally, Defendants Vikjord and Frescura called Plaintiff a rat and a snitch, and Plaintiff testified that those are names you call someone who tells on another.

The Court finds that while Plaintiff has submitted some circumstantial evidence of retaliatory intent, it does not amount to more than a mere scintilla of evidence, and it falls short of supporting Plaintiff's claim that his pursuit of prison grievances was the substantial or motivating factor behind the name calling.  *McCollum*, 647 F.3d at 882.  Accordingly, the Court recommends that Defendants Vikjord and Frescura be granted summary judgment on this claim.

### iii.   Cell Searches and Property Destruction

Plaintiff does not know who searched his cell in February 2007 and he offers no evidence regarding the August 2007 cell search.  With respect to the November 2006 cell search, Plaintiff testified that he saw Defendants Vikjord, Frescura, and Price enter and exit his cell while he was showering, and when he returned from the shower, his cell was trashed and property was missing or destroyed.

Cell searches are routinely effected in the furtherance of institutional safety and security, and even assuming that the state the cell was left in might support a reasonable inference that officers exceeded the bounds of a normal search and/or failed to follow the proper procedures in searching Plaintiff's cell and confiscating his property, there is simply insufficient evidentiary support to create a triable issue of fact as to motive.  *McCollum*, 647 F.3d at 882.  Plaintiff's evidence must amount to more than a mere scintilla and here it does not.

///

///

1          **iv.      August 25, 2007, Use of Force**

2          Plaintiff alleges that on August 25, 2007, Defendant Vikjord called him a crybaby while

3  escorting him in handcuffs from his housing unit to the ER.  (Comp., ¶42; Ex. A, p. 23.)  When

4  Plaintiff replied that is why he has lawsuits and grievances against Defendant, Defendant Vikjord

5  punched him several times on the right side of his forehead with a closed fist.  (*Id.*)  Defendant

6  Hernandez stood there and watched, without intervening.  (*Id.*)

7          As previously discussed, Plaintiff has submitted evidence that during the time period in

8  question, he was submitting grievances against officers.  At issue is Defendants Vikjord and

9  Hernandez's motive, and the evidence submitted by Plaintiff suffices to raise a triable issue of fact

10  regarding whether Defendant Vikjord became enraged and hit him because of his grievances and

11  litigation activities.  *McCollum*, 647 F.3d at 882.  However, Defendant Hernandez did not hit

12  Plaintiff and there is no evidence that he took adverse action against Plaintiff during the escort in

13  retaliation for Plaintiff's engagement in lawsuits and/or filing grievances.

14          **v.      Supervisory Liability**

15          Liability may not be imposed on supervisory personnel under the theory of *respondeat*

16  *superior*, *Iqbal*, 556 U.S. at 676-77; *Simmons*, 609 F.3d at 1020-21; *Ewing*, 588 F.3d at 1235;

17  *Jones*, 297 F.3d at 934, and as sergeants with supervisory authority, Defendants Salinas, Jr. and

18  Maldonado may only be held liable if they "participated in or directed the violations, or knew of

19  the violations and failed to act to prevent them," *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.

20  1989); *accord Starr v. Baca*, 652 F.3d 1202, 1205-08 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2101

21  (2012); *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009); *Preschooler II v. Clark County*

22  *School Board of Trustees*, 479 F.3d 1175, 1182 (9th Cir. 2007); *Harris v. Roderick*, 126 F.3d

23  1189, 1204 (9th Cir. 1997).  Some culpable action or inaction must be attributable to Defendants.

24  *Lemire v. California Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1074-75 (9th Cir. 2013); *Moss v.*

25  *U.S. Secret Service*, 711 F.3d 941, 967-68 (9th Cir. 2013); *Lacey v. Maricopa County*, 693 F.3d

26  896, 915-16 (9th Cir. 2012) (en banc); *Starr*, 652 F.3d at 1205; *Jeffers v. Gomez*, 267 F.3d 895,

27  914-15 (9th Cir. 2001); *Redman v. County of San Diego*, 942 F.2d 1435, 1446-47 (9th Cir. 1991);

28  *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).

1    Defendants Salinas, Jr. and Maldonado have met their burden by setting forth evidence

2  regarding the appeals process, their position that their job duties are not affected by inmates filing

3  grievances, and their lack of knowledge regarding complaints about their officers.

4    Plaintiff's evidence that Defendants Salinas, Jr. and Maldonado turned a blind eye to their

5  subordinates' retaliatory actions against Plaintiff and/or retaliated against Plaintiff themselves by

6  destroying his grievances is insubstantial at best.   Plaintiff has shown that he filed grievances

7  throughout the ten-month period by depositing them in the locked box to which Defendants had

8  the key, and the grievances were not processed.   In addition, Defendant Maldonado interviewed

9  Plaintiff on March 12, 2007, regarding a grievance he submitted in November 2006.   However,

10  Plaintiff never saw Defendants Salinas, Jr. and Maldonado destroy any grievances and there is no

11  evidence they ever made any statements to Plaintiff that would suggest any animus toward him for

12  filing grievances.   Furthermore, there is no evidence linking them, under a theory of supervisory

13  liability, to the incidents of force against Plaintiff in February 2007 and on August 25, 2007,

14  which are the only claims that survive Defendants' summary judgment motion.

15    Accordingly, Defendants Salinas, Jr. and Maldonado are entitled to judgment in their

16  favor.

17    **D.    <u>Qualified Immunity</u>**

18    Finally, Defendants argue that they are entitled to qualified immunity.   Given the findings

19  and recommendations set forth herein, the Court addresses this argument only with respect to the

20  claims which survive summary judgment.

21    Qualified immunity is "immunity from suit rather than a mere defense to liability; and like

22  an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."

23  *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted).

24  Qualified immunity shields government officials from civil damages unless their conduct violates

25  "clearly established statutory or constitutional rights of which a reasonable person would have

26  known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).   "Qualified immunity

27  balances two important interests - the need to hold public officials accountable when they exercise

28  power irresponsibly and the need to shield officials from harassment, distraction, and liability

1    when they perform their duties reasonably," *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct.

2    808 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the

3    law," *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

4         In resolving the claim of qualified immunity, the Court must determine whether, taken in

5    the light most favorable to Plaintiff, Defendants' conduct violated a constitutional right, and if so,

6    whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151

7    (2001); *Mueller*, 576 F.3d at 993. While often beneficial to address in that order, the Court has

8    discretion to address the two-step inquiry in the order it deems most suitable under the

9    circumstances. *Pearson*, 555 U.S. at 236 (overruling holding in *Saucier* that the two-step inquiry

10   must be conducted in that order, and the second step is reached only if the court first finds a

11   constitutional violation); *Mueller*, 576 F.3d at 993-94.

12        In this instance, the evidence viewed in the light most favorable to Plaintiff demonstrates a

13   constitutional violation and there exist triable issues of fact as to whether that right was violated.

14   Therefore, the Court proceeds without further discussion to the second step of the inquiry.

15        "For a constitutional right to be clearly established, its contours must be sufficiently clear

16   that a reasonable officer would understand that what he is doing violates that right." *Hope v.*

17   *Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508 (2002). While the reasonableness inquiry may not be

18   undertaken as a broad, general proposition, neither is official action entitled to protection "unless

19   the very action in question has previously been held unlawful." *Hope*, 536 U. S. at 739.

20   "Specificity only requires that the unlawfulness be apparent under preexisting law," *Clement v.*

21   *Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted), and prison personnel "can still be on

22   notice that their conduct violates established law even in novel factual circumstances," *Hope*, 536

23   U.S. at 741.

24        By 2006, inmates' rights to be free from the use of excessive physical force and to be free

25   from retaliation against them for filing prison grievances were clear. *Hudson*, 503 U.S. at 6-7

26   (articulating the standard for excessive force claims under the Eighth Amendment); *Rhodes*, 408

27   F.3d at 567, 569-40 ("Of fundamental import to prisoners are their First Amendment rights to file

28   prison grievances," and "the prohibition against retaliatory punishment is clearly established law

in the Ninth Circuit, for qualified immunity purposes.") (internal quotation marks and citations omitted).

The Court recognizes that the existence of material factual disputes does not necessary preclude a finding of qualified immunity. *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1053 (9th Cir. 2002). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," *Ashcroft v. al-Kidd*, __ U.S. __, __, 131 S.Ct. 2074, 2085 (2011). Here, however, assuming the facts in the light most favorable to Plaintiff, no reasonable officer would have believed that gratuitously punching a restrained, compliant inmate in the head out of anger and/or using physical force against a restrained, compliant inmate because he filed prison grievances was lawful.

Accordingly, Defendants Vikjord, Hernandez, Frescura, and Price are not entitled to qualified immunity.

**V.     Conclusion and Recommendation**

For the reasons set forth above, the Court HEREBY ORDERS that Defendants' motion for judicial notice is GRANTED, and the Court RECOMMENDS that Defendants' motion for summary judgment, filed on May 20, 2013, be GRANTED IN PART and DENIED IN PART as follows:

1.     Defendants' motion be GRANTED as to Plaintiff's Eighth Amendment claim arising out of being called a snitch and a child molester;

2.      Defendants' motion be GRANTED as to Plaintiff's Eighth Amendment claim arising out of the food tampering;

3.     Defendants' motion be DENIED as to Plaintiff's Eighth Amendment excessive force claim against Defendants Vikjord and Hernandez arising out of escort on August 25, 2007;

4.     Defendants' motion be GRANTED as to Plaintiff's retaliation claim arising out of delivery of the letter marked "deceased;"

5.     Defendants' motion be GRANTED as to Plaintiff's retaliation claim arising out of the threat to file and the subsequent filing of the false RVR and the claim be dismissed;

///

45

6.      Defendants' motion be GRANTED as to Plaintiff's retaliation claim arising out of the food tampering;

7.      Defendants' motion be GRANTED as to Plaintiff's retaliation claim against Defendants Vikjord and Hernandez for the use of force on or around February 18, 2007, but DENIED as to the claim against Defendants Frescura and Price;

8.      Defendants' motion be GRANTED as to Plaintiff's retaliation claim arising out of being called snitch, rat, and child molester;

9.      Defendants' motion be GRANTED as to Plaintiff's retaliation claim arising out of the cell searches and property destruction;

10.     Defendants' motion be DENIED as to Plaintiff's retaliation claim against Defendant Vikjord arising out of escort on August 25, 2007, and GRANTED as to Defendant Hernandez arising out of that incident;

11.     Defendants' motion be GRANTED as to Plaintiff's retaliation claims against Defendants Salinas, Jr. and Maldonado;

11.     Defendants Vikjord, Hernandez, Frescura, and Price's motion for qualified immunity be DENIED; and

12.     This matter be set for jury trial on Plaintiff's (1) Eighth Amendment excessive force claim against Defendants Vikjord and Hernandez, (2) First Amendment retaliation claim against Defendants Vikjord and Hernandez arising out of the use of force on August 25, 2007, and (3) First Amendment retaliation claim against Defendants Frescura and Price arising out of the use of force on or around February 18, 2007.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **twenty (20) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  Local Rule 304(b).  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections must be filed within **ten (10) days** from the date of service of the objections.  Local Rule 304(d).  The parties are advised that failure to file objections within the specified time may

waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **March 12, 2014**                        **/s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE